EDWINA B. MARTIN, Plaintiff-Appellee and Cross-Appellant, *v.* MY FARM, INC., *et al.* Defendants-Appellants and Cross-Appellees.

Fifth District   No. 82—139

Opinion filed January 7, 1983.

Richard G. Hershey, of Hershey, Bliss, Beavers, Periard & Romano, of Taylorville, for appellant My Farm, Inc.

Robert W. Dodd, of Fuchs, Dodd, Fuchs & Bawden, of Virden, for appellants Carl Spengler and Dianne Spengler.

Daniel W. Austin, of Miley, Meyer, Austin & Spears, P.C., of Taylorville, for appellee.

JUSTICE JONES delivered the opinion of the court:

This case arose out of a boundary dispute which resulted in an action for ejection. In dispute is the boundary running north and south between the east line of the tract owned by the plaintiff, Edwina Martin, and the west line of the tract owned by defendant, My Farm, Inc. (hereinafter My Farm). Defendants Carl and Dianne Spengler are purchasing the tract owned by My Farm under a contract for deed.

Plaintiff sought possession of the strip of land in question and damages. In defense My Farm asserted the existence of a boundary line established and undisputed for 40 years. The Spenglers asserted both adverse possession and the existence of a recognized boundary line in place on the premises for a period in excess of 20 years. The Spenglers counterclaimed, seeking dismissal of plaintiff's complaint at the cost of plaintiff and entry of an order establishing the boundary line as recited in the countercomplaint. In a bench trial the trial court found that the adverse possession of the defendants had commenced in 1966 and that the defenses and counterclaim had failed. The court found plaintiff entitled to possession of the disputed strip but not to damages and, accordingly, awarded possession to plaintiff. All defendants have appealed raising several issues, and the plaintiff has cross-appealed on the issue of damages. In view of the disposition we make in this case we set forth only those facts relevant to the issue of adverse possession.

At one time plaintiff owned both tracts, having inherited them as one property in 1909 at the age of two from her father. In 1925 or 1926 her guardianship ended with her marriage. In 1934 she conveyed

a tract on the east part of her property to her mother, Beulah Turner. The description in the deed was "19 acres off of the East side of the West half of the Southeast quarter of Section 32, ***." In 1966 Pasquo Podeschi, president of My Farm, bought the east tract at auction. In 1977 the Spenglers bought the east tract from My Farm under a contract for deed.

The property had been used as farmland apparently since at least 1909 and has been farmed by tenants almost all of that time. The tenants—often a common tenant for both tracts—farmed up to a fence running north and south, paying rents to the owner of each of the two tracts according to the location of the fence. Thus, the owner of the east tract received rents based upon the crops raised to the east of the fence, and the owner of the west tract, that is, plaintiff, received rents based upon the crops raised to the west of the fence. At one time the fence extended approximately half a mile, from the north boundary to the south boundary of the plaintiff's original property. At the time of trial only about 40 yards of the fence remained, the rest having been removed. The section of the fence that remains extends north from the south boundary of the property. Between the northernmost part of the fence and the north boundary of the property a crop or tillage line appears. In 1980 at plaintiff's request the east line of the west tract was surveyed. The survey placed the east side of plaintiff's tract approximately 80 to 90 feet east of the fence. Plaintiff thereupon brought suit in ejectment to recover possession of the 80 to 90 foot strip. The plaintiff also sought damages for rent for the disputed strip from the date of the survey to the time of trial.

Plaintiff testified that she and her mother usually had a common tenant who farmed both tracts. She said that Dillon Pyle, who had died in 1966, had farmed the land for her commencing in the thirties. At no time had plaintiff lived on either of the two tracts. She said that she and her tenants had never discussed the location of her property lines, that she did not know how the property lines had been set, and that she and her mother had never had an agreement as to where the property lines would be. She stated that she had never had any dispute with Pasquo Podeschi or Carl Spengler with regard to the boundary line. The crop line, she said, had remained the same from 1926 to 1980. She indicated that the fence line had been there as long as she could remember. She stated that the purpose of the fence was to keep in hogs and that the fence had no other purpose. Asked upon redirect examination to explain what she had meant by her earlier use of the term "boundary line," she answered, "Well, I assume that division between the two places." Upon recross by the attorney for the

Spenglers the following colloquy took place:

"Q: And you said in response to [plaintiff's attorney's] question as to what you meant by boundary line that you meant that to be, you assumed the division between the two places.

A: I guess; yes, I did assume.

Q: And that, that division that you're talking about is the fence that's depicted in Plaintiff's Exhibit 2, is that right?

A: Right."

Plaintiff indicated that she had received a "notification" from "the Assessors [sic] Office that I was not reporting the right number of crop acres. Therefore, I assumed it was my duty to get it surveyed and get the right boundary line."

Testifying for plaintiff, Dave Hohn, the farm manager at the bank which had managed plaintiff's farm at least since 1968, said that plaintiff had been receiving income from the acreage up to the fence. He stated that a tenant "would know what the accepted division line was."

Testifying for the defendants was Howard Pyle, son of Dillon Pyle, both of whom had farmed the two tracts. At the time of trial in 1981 Howard Pyle was 45 years old. He testified that at the age of two, that is, in 1938, he had begun to reside on the west tract, that by the time he was nine or 10 years old he was helping his father with the field work, and that by the age of 15 he was doing all the planting. He lived on the west tract until 1968. In the early fifties he and his father began to farm both tracts, and the witness continued to do so until Pasquo Podeschi purchased the east tract in 1966. The witness farmed the west tract until 1968. He said that in approximately 1951 there was a fence extending "all the way from the south end to the north end except for two gaps," which together amounted to a total of about 140 feet. He stated that the fence was absolutely necessary in order to conduct the "hog operation." He classified the fence as a "division fence." He and his father apparently removed part of the fence leaving two posts in the middle so that they would have "something to go by." They also left a post on the fence line at the north boundary of the property. The witness called this post the "corner post" and described it as "a little bigger than the other posts," saying that "we left it so it would be the corner of the property line that we knew." At the time of trial, of these posts only the "corner post" remained. The witness testified that he had farmed as close to the fence as possible, stating that he had farmed the property on the east side of the fence for Ralph Turner, Beulah Turner's husband, and that he had farmed the property on the west side of the

fence for Martin. He said that "the money from the grain sales and everything on the east side went to Turner" and "the money from everything on the other side went to Martin." No one, he said, had ever told him where the boundary line was. He had merely assumed that the fence, which he described as "straight," was the boundary line.

Pasquo Podeschi testified that he was aware of the fence in 1937 and in 1938 when he went to speak to Dillon Pyle about doing some work for him. He stated that Dillon Pyle first farmed plaintiff's property and later farmed both tracts. he said that when he farmed the area where there was no longer any fence, he "sighted" to the post earlier described as the corner post. He described the division line where there is no longer any fence as a little grassy ridge. He said that he had never farmed across that ridge and that plaintiff's tenant had never, to his knowledge, farmed across the line.

Also testifying for defendants was Everett Ayers, plaintiff's tenant since 1968. He testified that he farms only up to the fence and that he had farmed for Pasquo Podeschi for two years and had farmed only up to the fence on the other side. He said that, to his knowledge, the line had never changed, the northernmost point being the wooden post earlier described as the corner post. He said no one had directed him to any line to which to farm but that he had just farmed to "that assumed line," based upon a map provided when he rented the farm. Of the area described by Pasquo Podeschi as a grassy ridge, the witness said that "it's just pretty flat." To determine where to farm in the area where there is no fence he would, he said, "drive as straight as you could from one post to the other one," the fence posts being the lone fence post, or "corner post," at the north line of the property and the northernmost fence post of the fence that remains. The line created by so driving his tractor would not be perfectly straight but "you wouldn't get off more than probably 20 inches. That might just be a bow in the middle."

■ We conclude from our examination of the record, particularly the testimony of the plaintiff, that the boundary line was mistakenly thought to be the fence line until 1980 when the east line of plaintiff's tract was surveyed. In *Joiner v. Janssen* (1981), 85 Ill. 2d 74, 421 N.E.2d 170, where the parties mistakenly believed that the boundary line was a certain tree and bush line, the court discussed the effect upon claiming title adversely when possession is taken under mistake or ignorance concerning boundary lines:

> "As we earlier noted, the possession forming the claimed ownership in the present case was based upon the mistaken be-

lief of the parties that the boundary was the tree and bush line. In these circumstances some jurisdictions have applied a subjective test, holding that the intention of the possessor is the controlling factor in determining whether possession to a mistaken boundary is hostile. Thus, if a landowner through mistake or ignorance takes possession to a boundary beyond the true line intending only to claim to the true line and not intending to claim the additional land if it should be ascertained that the boundary is not as he thought it, then such possession is not adverse or hostile. (Annot., 80 A.L.R.2d 1171, 1174 (1961).) Elsewhere, including Illinois, occupancy to a visible and ascertained boundary for the statutory period is deemed the controlling feature in determining hostility in mistaken-boundary cases. (*Walter v. Jones* (1958), 15 Ill. 2d 220; *Cassidy v. Lenahan* (1920), 294 Ill. 503; *Hellman v. Roe* (1916), 275 Ill.158; *Rich v. Naffziger* (1911), 248 Ill. 455; *Daily v. Boudreau* (1907), 231 Ill. 228; *Krause v. Nolte* (1905), 217 Ill. 298, *Hubbard v. Stearns* (1877), 86 Ill. 35; Annot. 80 A.L.R.2d 1171, 1183 (1961).) The difficulty with the subjective test is that it affords no protection to the landowner who innocently and mistakenly occupies and improves land beyond his boundaries. He can never acquire title thereto. Conversely, he who deliberately sets out to steal adjacent land may succeed. Consequently, '[i]n a growing number of jurisdictions occupancy to a visible and ascertained boundary for the statutory period is deemed the controlling feature in determining hostility in mistaken boundary-line cases. Thus, it is held with increasing frequency that an open, notorious, and hostile possession of property for the statutory limitation period is sufficient for the acquisition of title by adverse possession, and the fact that the possession was taken under mistake or ignorance as to boundary lines is immaterial.' 3 Am. Jur. 2d *Adverse Possession* sec. 39, at 125-26 (1962)." (85 Ill. 2d 74, 82-83, 421 N.E.2d 170, 174-75.)

Because the claim to ownership need not be spoken or supported by title documents, as one's actions are able to convey adequately the intent to claim title adversely to all persons including the titleholder, what the property description in a deed held by the adverse possessor excludes or includes is irrelevant to the issues of adverse possession. *Joiner.*

■ What is essential to establish title under the twenty-year doctrine of adverse possession (Ill. Rev. Stat. 1981, ch. 83, par. 1) is the concurrent existence of the five elements of adverse possession for 20

years: (1) continuous, (2) hostile or adverse, (3) actual, (4) open, notorious, and exclusive possession of the premises, and (5) under claim of title inconsistent with that of the true owner. (*Joiner*.) As was said in *Joiner*,

> "The 'hostile' nature of the possession does not imply actual ill will, but only the assertion of ownership incompatible with that of the true owner and all others. [Citation.] 'Where there has been an actual, visible and exclusive possession for twenty years it is not essential to the bar of the Statute of Limitations that there should have been any muniment of title or any oral declaration of claim of title, but it is sufficient if the proof shows that the party in possession has acted so as to clearly indicate that he did claim title, [*sic*] 'No mere words could more satisfactorily assert that the defendant claimed title than its continued exercise of acts of ownership over the property for a period of twenty years does. Using and controlling property as owner is the ordinary mode of asserting claim of title, and, indeed, is the only proof of which a claim of title to a very large proportion of property is susceptible." [Citations.] *** Such improvements or acts of dominion over the land as will indicate to persons residing in the immediate neighborhood who has the exclusive management and control of the land are sufficient to constitute possession. [Citations.]' " 85 Ill. 2d 74, 81-82, 421 N.E.2d 170, 174.

■ Presumptions exist in favor of the owner of title, and the burden of proof on the adverse possessor requires proof of each of the five elements by clear and unequivocal evidence. (*Joiner*.) In a case where an adverse possessor is claiming to a mistaken or disputed boundary line, the location of the boundary must be established by clear and convincing proof. (*Joiner*.) In *Joiner* the court, quoting, described the nature of that proof:

> " 'The proof must be such as to establish with reasonable certainty the location of the boundaries of the tract to which the five elements of adverse possession are applied and all of the elements must extend to the tract so claimed. While it is not necessary that the land should be enclosed by a fence, the boundaries must be susceptible of specific and definite location.' " 85 Ill. 2d 74, 83, 421 N.E.2d 170, 175.

■ ■ Bearing these principles in mind, we think that the defendants have satisfied their burden of proof as to the boundary line they claim. Although possession was much of the time not actually in the adverse possessor but in a tenant farming the land, the possession of

the tenant was in the interest of his landlord, and the landlord may be said to have been in possession through the tenant. Furthermore, receipt of rents by the adverse possessor from the tenant was an exercise of an act of ownership, a use and control of the property consistent with a claim to the ownership of it.

■ In view of the fact that the trial court found the adverse possession to have begun in 1966, the court seems to have concluded that such possession began with the transfer of title apparently out of Beulah Turner's estate. However, nothing changed at that time except the name of the title holder. With regard to the possession of the land and the disposition of the rents, the land continued to be farmed to the fence and the rents paid accordingly. Although the trial court did not state expressly that there could be no adverse possession by the mother against the daughter, such an assumption seems implicit in the court's finding that the adverse possession began in 1966, the year when title was transferred to a third party. There is, however, nothing in the record to suggest that a fiduciary duty existed between mother and daughter, who was an adult at the time she conveyed the property to her mother. For this reason adverse possession could have begun and did, in fact, do so before the transfer of title in 1966. The evidence suggests that the adverse possession probably began when the property was conveyed in 1934. Even if the evidence was found to show that adverse possession did not begin until 1951, for example, when Howard Pyle, at the age of 15, began to do all of the planting for his father while the fence was nearly intact, or even until 1956, after he and his father had begun to farm both tracts, farming to the fence line and the disposition of rents in accord with that line continued without complaint until 1980, a period of time well exceeding the requisite statutory period of 20 years.

In view of our disposition of the question of adverse possession we need not consider the other issues defendants raise or the issue of damages plaintiff raises in her cross-appeal.

Reversed.

WELCH and KARNS, JJ., concur.