NOTICE

Decision filed 12/31/20. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2020 IL App (5th) 190245-U

NO. 5-19-0245

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| PAUL L. LASH JR., Trustee of the Paul L. Lash Jr. Revocable Trust; DARRELL SCHAAL; BARBARA SCHAAL; RALPH M. BERRY; and JUSTIN LLOYD SCHAAL, | ) ) ) ) | Appeal from the Circuit Court of Clay County. |
| Plaintiffs-Appellees, | ) ) ) | |
| v. | ) ) | No. 15-CH-6 |
| DARRIN HOUT, | ) ) | Honorable Michael D. McHaney, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the plaintiffs were unable to establish the specific location and description of the boundaries of a disputed piece of land by a reasonable certainty, we find that the trial court's judgment was contrary to the manifest weight of the evidence and vacate its judgment for the plaintiffs quieting title to that land.

¶ 2    The defendant, Darrin Hout, appeals from the trial court's judgment quieting title to a portion of his land in Clay County pursuant to adverse possession. At issue on appeal is whether the plaintiffs sufficiently proved the location and description of a boundary line sufficient for the trial court to have determined that they met the legal requirements for adverse possession. For the reasons stated in this order, we vacate the trial court's judgment quieting title to Hout's land in favor of the plaintiffs.

1

¶ 3                           BACKGROUND

¶ 4    The plaintiffs (hereinafter referred to collectively as the Lash owners) and Hout own farmland in Clay County. The Lash owners' land is owned, in part, by the Paul L. Lash Jr. Revocable Trust which was created on March 11, 2010. Ownership interest in the land also lies with Darrell Schaal, Barbara Schaal, Ralph Berry, and Justin Lloyd Schaal. Lash has owned the land either personally or in the trust for 33 years as of May 2016, when the second amended complaint was filed. As of May 2016, Hout had owned his land for 15 years.

¶ 5    The Lash owners alleged that for 20-plus years, the boundary line between the Lash owners' and Hout's properties was established by a straight line designated by landmarks. The north end of the property ended at a tree line. At the northeast end of the tree line, there was a ditch. The south end of the disputed land ended at a township road called Seal Drive. A strip of land about 10 to 20 feet west of the established boundary between the two lands had become an issue. For the alleged 20-plus years, the Lash owners, or persons appointed or hired by the Lash owners, farmed the disputed strip of land. Hout bought the land in 2005, and until 2014, when he had the land surveyed, he farmed the land utilizing the same boundary line between the two properties relied upon by the Lash owners.

¶ 6    In 2008 or 2009, Hout learned through GPS technology on his farming equipment that the crop lines being used by both parties were inconsistent with the title to his land. Based upon the GPS data, in 2014, he commissioned a survey to confirm his suspicions. The survey confirmed that the Lash owners were farming part of Hout's land. Thereafter, Hout installed railroad ties along the surveyed property line and began farming up to the posts.

¶ 7    The Lash owners filed suit against Hout in July 2015, seeking injunctive relief for his alleged trespass. The trespass claim was based upon the 20-plus years during which the Lash

2

owners had consistently farmed the disputed land. Alternatively, the Lash owners asked the trial court to quiet title to the disputed land based on adverse possession. The adverse possession claim was also based upon the 20-plus years of consistent farming of the disputed land.

¶ 8    After a bench trial held on April 11, 2019, the trial court entered its order, dated April 12, 2019, in the record sheet. The order states as follows:

> "This court having considered sworn testimony and arguments of counsel, having reviewed exhibits and case law submitted, hereby finds that the plaintiffs are good ole boy farmers who were honest as the day is long; though the description of the boundary was by no means perfect, it was sufficiently demarcated; accordingly, this court finds in favor of the plaintiffs and against the defendant regarding the second amended complaint ***."

The final judgment was entered by the trial court on May 20, 2019. The trial court found that the Lash owners established by clear and convincing evidence that they were the record title holders of the disputed land because they, or their predecessors in interest, had been in continuous, hostile, adverse, actual, open, notorious, and exclusive possession of the disputed land under a claim of title inconsistent with Hout's title, over a period of at least 20 years, extending from 1986 through 2014. The trial court also barred Hout from entering and farming on the disputed land. Hout timely filed his notice of appeal from this judgment.

¶ 9                                              ANALYSIS

¶ 10    The required legal standards that the Lash owners were required to prove are not in dispute. Adverse possession is a long-standing method of establishing title to land. The adverse possession 20-year statute of limitations is incorporated in section 13-101 of the Code of Civil Procedure, which states that:

> "No person shall commence an action for the recovery of lands, nor make an entry thereon, unless within 20 years after the right to bring such action or make such entry first accrued, or within 20 years after he, she or those from, by, or under whom he or she claims, have acquired title or possession of the premises ***." 735 ILCS 5/13-101 (West 2018).

3

The party claiming adverse possession must establish that possession of the land during the requisite 20-year period was "(1) continuous, (2) hostile or adverse, (3) actual, (4) open, notorious[,] and exclusive, and (5) under claim of title inconsistent with that of the true owner \*\*\*." *Tapley v. Peterson*, 141 Ill. App. 3d 401, 404 (1986) (citing *Joiner v. Janssen*, 85 Ill. 2d 74, 81 (1981)). Further, the party must establish that these five elements existed concurrently throughout the 20-year period. *Id.* Whether possession of another party's land occurred due to a mistake or ignorance of the correct boundary lines is not material to a determination of whether the possession was adverse. *Id.* (citing *Martin v. My Farm, Inc.*, 111 Ill. App. 3d 1097, 1102 (1983)).

¶ 11 The "hostility" required to establish the hostile or adverse element of adverse possession "does not imply actual ill will, but merely the assertion of ownership incompatible with that of the true owner and all others." *Id.* (citing *Martin*, 111 Ill. App. 3d at 1103). In Illinois, actions alone are sufficient to convey the person's intent to claim title adversely to the titleholder. *Id.* (citing *Joiner*, 85 Ill. 2d at 82). As the Illinois Supreme Court stated long ago:

> "No mere words could more satisfactorily assert that the defendant claimed title, than its continued exercise of acts of ownership over the property for a period of more than twenty years does. Using and controlling property as owner is the ordinary mode of asserting claim of title—and, indeed, is the only proof of which a claim of title to a very large proportion of property is susceptible." *James v. Indianapolis & St. Louis R.R. Co.*, 91 Ill. 554, 557 (1879).

¶ 12 While a deed is not necessary to establish the location of the boundaries claimed by the party asserting ownership through adverse possession, if there is no deed or color of title, then the party bears an additional burden to establish the location of the boundaries he claims. *Tapley*, 141 Ill. App. 3d at 404 (citing *Schwartz v. Piper*, 4 Ill. 2d 488, 493 (1954)). The boundaries at issue "must be definitely established at the inception, during the continuance[,] and at the

4

completion of the period of adverse possession." *Id.* This means that the party "must prove with reasonable certainty the location of the boundaries of the tract to which he seeks to apply the five elements of adverse possession, and all of the elements must extend to the tract so claimed throughout the statutory period." *Id.* at 404-05. Further, while the land does not need to be enclosed by a fence, "the boundaries must be susceptible of specific and definite location." *Id.* at 405. In other words, before the party asserting adverse possession can establish the five elements, the party must establish the boundaries of the land at issue with definite and specific location and reasonable certainty. *Id*. at 404-05.

¶ 13 The doctrine of adverse possession must be strictly construed, and its elements cannot be established by implication or inference. *Id.* at 405 (citing *Cagle v. Valter*, 20 Ill. 2d 589, 592 (1960)). "All presumptions are in favor of the owner of title, and to overcome such presumptions the adverse possessor has the burden of proving each of the five elements by strict, clear[,] and unequivocal evidence." *Id.* (citing *Martin*, 111 Ill. App. 3d at 1103). If the trial court determines that the adverse possessor has established the five elements, the reviewing court cannot reverse that conclusion unless the trial court's findings are contrary to the manifest weight of the evidence. *Id.* (citing *Brosie v. Borrowman*, 29 Ill. App. 3d 936, 938 (1975)). A decision is contrary to the manifest weight of the evidence when the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence. *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28 (citing *In re Joseph M.*, 398 Ill. App. 3d 1086, 1089 (2010)).

¶ 14 Here, the Lash owners did not have a deed or color of title to the disputed land. Therefore, the Lash owners were required to first establish the boundaries with reasonable certainty—that is, they were required to establish that the boundaries were "susceptible of specific and definite location." *Tapley*, 141 Ill. App. 3d at 405. Further, they were required to

5

establish that these boundaries were used from the origination, during, and at the conclusion of the 20-year statutory requirement for adverse possession. *Id.* at 404. Any deviation of the boundary line over the 20 years—"even if only a foot or two"—is of "grave importance." *Schwartz*, 4 Ill. 2d at 496. The visible and ascertainable boundary line must be proven by clear and convincing evidence. *Stankewitz v. Boho*, 287 Ill. App. 3d 515, 518 (1997).

¶ 15 Hout disputes that the Lash owners satisfactorily established the boundaries of the disputed land at all relevant time periods, and he therefore argues that the trial court's order quieting title to the disputed land is erroneous. To determine whether the Lash owners adequately established the boundaries of the disputed land sufficient to warrant the trial court's adverse possession finding, we turn to the April 11, 2019, trial testimony of all witnesses, as well as the exhibits introduced into evidence.

¶ 16 Paul Lash Jr. testified that he had been a farmer since 1973. The land at issue is in Larkinsburg Township, south of Iola in Clay County. Lash has farmed the land since 1986, but he had no ownership interest at that time. The land was part of an estate, and Lash purchased a large ownership percentage from three heirs. He did not know the years in which the three separate land transactions occurred. At the time of this lawsuit, Ralph Berry, one of the plaintiffs in this case, was the sole remaining heir to the estate who owned a percentage of the land.

¶ 17 Lash testified that he had always farmed the land from "where it had been farmed the previous year by the prior tenant" to "where his crop ended." When he began farming this land, there were no specific landmarks he utilized to guide him. But with each year, he continued to farm the land "to the last row that we did the prior year."

¶ 18 Much of Lash's testimony focused on features of the land that defined the boundaries of the land he had farmed since 1973. He testified that on the north end of the disputed land, there is

a ditch at the east end of a tree line. The tree line extends along the north end of the land. The small ditch drains to the north, off the property, and wraps around the east end of the tree line. Lash testified that the ditch has not moved since 1986. The south side of the disputed land ends at a road that runs east to west and is marked by two signs and a telephone riser/fiber optic post. One of the signs directs drivers to a Baptist cemetery, while the other identifies the township road as Seal Drive. None of the signs have been moved since 1986. Lash testified that on the north end of the field, he would farm approximately 10 feet west of the end of the tree line, while on the south end of the field, he would farm approximately 20 feet past a current white post that establishes Hout's surveyed line. Lash claimed that all the identifying landmarks were present in 1986 as they were on the date of the trial.

¶ 19 Lash testified that in 2014, Hout had the land surveyed and placed railroad ties to delineate the boundary. Thereafter, Lash testified that he was no longer able to farm the disputed strip of land.

¶ 20 On cross-examination, Lash acknowledged that the east end of the tree line that he previously identified as the landmark on the north end of the field contained tree trunks, tree branches, trees that were alive, and at least one that had no leaves on it. At the north end of the field, after Hout had the survey conducted, the surveyor placed survey pins up in one of the trees. In Lash's testimony, he agreed that a survey pin is a metal rod less than one inch in diameter. On the south end of the field, Lash acknowledged that the township road sign and the church cemetery sign were some distance apart. When he was asked to identify which sign he farmed to on the south side of the land, he stated: "Well, I guess I can't really answer that. They're not very far apart. They're only like three feet apart. I just farmed the property to where the prior tenant farmed it the last year that he did it. And it was in that vicinity." Lash admitted that he had a

7

worker who farmed this field "[m]any years ago" who had conducted his own survey, but Lash testified that he did not have a copy of that survey. He also conceded that Hout's survey was in addition to the one that had been conducted by his former worker. Lash testified that he did not have his own survey to establish the boundary line he had farmed since 1986 and stated that he could not provide a precise measurement from the north end of the field to the south end of the field.

¶ 21    Darrell Schaal testified that he is married to Lash's daughter. He became familiar with the disputed boundary line when he began farming the land in 1991. He is currently an owner of the land but did not know the year when he obtained ownership status. Darrell explained that he would farm using the east edge of the tree line from the north end to "the road sign" at the south end, in a straight line between those two points. Darrell testified that on the east edge of the tree line, he would start at the ditch depicted in the photographic exhibits with standing water, and then he would run equipment to a visible road sign on the south end of the field; and that sign "married up to the line that was out there from the previous crop." He testified that he "usually" drove towards the township road sign because it was the tallest and the easiest to see from that distance. On cross-examination, Darrell testified that while the ditch on the east end of the north end of the field had been there since 1991, he acknowledged that Hout "may have cut a ditch there," but that he did not know that for a fact, and that he could not say if the ditch there today "is the exact same ditch."

¶ 22    Justin Schaal testified that Darrell is his father. He has become an owner of the land. He became generally familiar with the property in 1993 or 1994, when he and his dad began going to the woods in the tree line on the north end. Justin testified that he began farming the land in 2005. He described the boundaries of the disputed land as the "east end of the fence row [*sic*]"

8

on the north end and aiming for the township road sign on the south end. Justin testified that the ditch was located on the northeast end of the fencerow. He explained that each year he would go back to the previous year's crop rows, and then in 2008, they added GPS to replicate the lines. Justin stated that they used the GPS in the planter to follow the same line as planted the previous year—not to match coordinates of a surveyed line.

¶ 23    Kevin Lash testified that Paul Lash Jr. is his uncle. Kevin is a professional farmer. He identified the land at issue as the Quarry Berry farm with approximately 20 tillable acres. In 2007, when he was 16 years old, he began helping his uncle on this farm. Thus, he has been familiar with the disputed land since 2007. He identified the fencerow on the north end of the field in a photograph and testified that it marked the northeast corner of the property. He further explained that they would farm to the ditch at the end of the fencerow. On the south end of the field, they would head to the signs. He identified the township street sign, the Baptist cemetery sign, as well as the telephone marker pole on the south end of the field from photographs used at trial. Kevin acknowledged that since 2014, they had been farming according to the railroad ties placed along the survey line.

¶ 24    Hout testified that he has owned his farmland since 2005. In 2007 or 2008, he noticed that water had begun pooling on his side of the disputed land on the north end of the field, and that as a result, his crops in the area had suffered. The water was flowing from Lash's land onto his land. To drain the water from the field, Hout "cut the ditch" with a backhoe in 2007 or 2008. He testified that he did not believe that the ditch existed prior to then, but he did not know for certain. After he cut the ditch, the water drainage problem with his land and crops was alleviated.

¶ 25    Hout had the survey completed by Kevin L. Utz, an Illinois professional land surveyor. Hout testified that, upon completing the survey, Utz put wooden laths and steel pins out along

9

the correct boundary line. The laths extended approximately three feet above the ground and the steel pins were placed into the ground. The first year after the surveyed line was marked, someone removed or knocked down the wooden laths and farmed the land. Hout testified that the second year after the survey, he marked the surveyed line with PVC pipes extending from the ground. Again, someone removed or knocked down the PVC pipes and farmed the land. In the third year, Hout had Utz resurvey the boundary line consistent with the pins. Hout testified that he installed railroad ties following the survey line in this third year to mark the accurate boundary between the properties. He testified that no one removed or knocked down the railroad ties.

¶ 26    Hout testified that he learned of the boundary discrepancy when he began farming from north to south using his GPS with the defined property coordinates. He explained that his tractor was attempting to follow the GPS coordinates, which were noticeably different from what he had routinely farmed.

¶ 27    Darrell Schaal was recalled to testify in rebuttal to Hout's testimony about the ditch. Darrell again confirmed that the ditch was at the end of the tree line on the north end of the field. Darrell was asked if the ditch was there in 1991 when he began farming the land. The following exchange occurred:

> "DARRELL SCHAAL: Again as I stated earlier, that exact ditch, was it there? I can't say that. If [Hout] says that he dug that with a backhoe, I've got no reason to dispute it. I do know that as [Hout] mentioned, the natural water flow wants to go north at this direction. There was some type of natural ditch there.

> MR. MYERS [(ATTORNEY FOR THE LASH OWNERS)]: In that exact location we've been talking about this whole time?

> DARRELL SCHAAL: In that general location. Yes."

¶ 28    Having reviewed the testimony at trial as well as the photographs entered into evidence, we turn to the boundary issue and analyze whether the Lash owners and their witnesses sufficiently established by clear and convincing evidence that the boundaries of the disputed land were "susceptible of specific and definite location." *Tapley*, 141 Ill. App. 3d at 405; *Stankewitz*, 287 Ill. App. 3d at 518. We are reminded that any deviation of the boundary line during the 20-year adverse possession period is significant. *Schwartz*, 4 Ill. 2d at 496.

¶ 29    The Lash owners primarily rely upon their statements that each of the owners who physically farmed the land utilized the previous year's crop lines. We conclude, however, that simply stating that they followed a crop line each year is, by itself, insufficient for the degree of specificity required for identifying the boundaries. Crop lines could vary slightly from year to year. Therefore, we review the landmarks on both ends of the fields.

¶ 30    The landmarks on the south end of the field were two separate signs—one was a cemetery sign and the second was a township sign. Darrell and Justin testified that on the south end of the field, they headed to the township sign marking Seal Drive. Lash and Kevin testified that they headed towards both signs and did not indicate that one of the signs took precedence. Lash testified that the two signs are approximately "three feet apart." Having viewed the photographs entered into evidence at trial, we note that the township sign was the taller of the two signs, which is consistent with Darrell Schaal's testimony. We also note, as Lash testified, that the signs were within approximately three feet of each other. However, if Lash and Kevin farmed to the cemetery sign, instead of the township sign, we must question whether the difference of approximately three feet is a deviation sufficient to preclude a finding of adverse possession. *Id.*

¶ 31    We find that there are more significant concerns on the north end of the field than the potential one-yard difference at the south end of the field. The landmarks on the north end of the field were a tree line and a ditch. The north end of the field is described as ending in a fencerow, more specifically described as a line of trees—some dead, some reduced to stumps, and some alive. At the east end of the line of trees is the ditch that all witnesses referenced at trial. No witness testified to the dimensions of the ditch. Furthermore, no witness testified to the distance from the ditch to the field being farmed. Lash testified that the ditch was located, and wrapped around, at the east end of the tree line. He claimed that nothing about the ditch had changed since 1986. Darrell testified that he started at the ditch and headed south down the field each time he farmed the land. He stated that the ditch had been there since 1991 when he began farming for Lash. Justin testified that he would start farming from the east end of the fencerow, which is "where that ditch is." Kevin testified that they would farm to the ditch at the end of the fencerow. Justin and Kevin did not testify specifically about the ditch and whether it had changed throughout the years each had farmed the land. Hout testified that he "cut the ditch" in 2007 or 2008 to alleviate a water flow issue that was causing water to run from Lash's property to Hout's property and damaged his crops. Hout acknowledged that he was uncertain if the ditch had been there prior to 2007 or 2008, but by cutting a ditch, he modified the terrain, and that modification fixed the water flow problem. Darrell was asked about Hout's statement that he cut the ditch in 2007 or 2008. Darrell testified that he did not know whether the ditch present when the railroad ties were installed on the boundary line was the same as the ditch he remembered from 1991. Darrell stated that he had no reason to dispute Hout's claim but stated that there was always some sort of a natural ditch there in the "general location." We conclude that the modification of the ditch, however slight, is a deviation of the visible and ascertainable boundary line that is

12

required by *Stankewitz*. *Stankewitz*, 287 Ill. App. 3d at 518. Moreover, we find that the Lash owners' failure to provide any dimensions of the ditch itself, and the distance from the field to the ditch, is a critical omission, preventing them from establishing a specific and definite boundary for the north end of the disputed land. *Id.*

¶ 32    As stated earlier, the Lash owners have attempted to establish the boundary line by stating that they followed the crop line from the previous year. One of the exhibits they used in their case had a yellow line drawn upon a photograph. The Lash owners claimed that this line demarcated the boundary that was the subject of their claim for adverse possession. They had no survey conducted to support this boundary line to establish, perhaps, that the line they followed never deviated from year to year. Further, Lash acknowledged that a neighboring farmer named Brian Horath, who also used to farm for Lash, had his own survey conducted of the disputed land, but the Lash owners did not have a copy of that survey.

¶ 33    We conclude that the Lash owners failed to establish the boundaries with reasonable certainty. The testimony and exhibits did not establish particular boundaries for two reasons. First, the evidence did not establish a precise location for either the north or sound boundary. The signs used as landmarks on the south end of the field are spaced approximately one yard apart. On the north end of the property, the witnesses did not describe the ditch with consistency. Second, the evidence did not clearly establish that the location of the northern boundary remained precisely the same over the 20-year period. As discussed previously, no evidence established that the ditch cut by Hout in 2007 or 2008 was in the same, precise location as the preexisting ditch. If the boundary line deviated by so much as one to two feet sometime during the 20-year period, that deviation is considered gravely important. *Schwartz*, 4 Ill. 2d at 496. Moreover, the Lash owners provided no specific dimensions of this northeast ditch, nor did they

13

provide any distance measurements from the ditch to the field. Further, there is absolutely no evidence of the distance from the north end to the south end of the field. While the Lash owners used this land for many years, and would like to claim title to the land by use of the adverse possession doctrine, there must first be clear and convincing evidence that the boundaries of the disputed land are of specific and definite location. *Tapley*, 141 Ill. App. 3d at 405. Accordingly, we conclude that the trial court's order quieting title to the disputed land in favor of the Lash owners is contrary to the manifest weight of the evidence, and we vacate the judgment. *Id.* (citing *Brosie*, 29 Ill. App. 3d at 938).

¶ 34                                      CONCLUSION

¶ 35     For the foregoing reasons, we vacate the May 20, 2019, order of the Clay County circuit court.


¶ 36     Vacated.

14